IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

ANGEL FEBUS-RODRIGUEZ, et al

    Plaintiffs

           **v.**

ENRIQUE QUESTELL-ALVARADO, et al

    Defendants

**Civil No. 06-1627 (SEC)**

**OPINION and ORDER**

Pending before this Court is the Municipality of Santa Isabel's ("Municipality") Motion for Summary Judgment (Dockets ## 56 & 72), Plaintiffs' opposition thereto (Dockets ## 113 & 121), and the Municipality's Reply (Docket # 124-2). On July 13, 2009, the Municipality's Mayor, Enrique Questell-Alvarado ("Questell"), and the Human Resources Director, Natalie Rodriguez-Cardona, requested leave to join the Municipality's motion for summary judgment. Said request is hereby **GRANTED**. Upon reviewing the filings, and the applicable law, the Municipality, Questell, and Rodriguez's (collectively "Defendants") Motion for Summary Judgment is **GRANTED in part and DENIED in part.**

**Factual Background**

On June 22, 2006, Plaintiffs filed suit against Defendants under Section 1983, 42 U.S.C. § 1983, and Articles 1802 and 1803 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, §§ 5141 & 5142.[1] In the complaint,[2] Plaintiffs, employees of the Municipality, allege that they were terminated from their positions due to their political affiliations with the Popular Democratic

---

[1] Plaintiffs' claims under Law 100, their substantive due process claims, and their request for punitive damages were dismissed by this Court. See Docket # 34. Also, Plaintiffs voluntarily dismissed their COBRA claims. See Dockets ## 38 and 148.

[2] Plaintiffs filed the initial complaint on June 22, 2006. Docket # 4. Thereafter they filed an amended complaint (Docket # 5), and a second amended complaint (Docket # 39).

Party ("PDP"), after Questell, the candidate for the New Progressive Party ("NPP"), won the November 4, 2004 mayoral elections in the Municipality.   After extensive discovery, the Municipality filed a motion for summary judgment on the following grounds: (1) that Plaintiffs' political harassment claims are time-barred; (2) that they have failed to adequately state procedural due process claims; (3) that Plaintiffs have failed to establish a *prima facie* case for political discrimination; (4) that there are legitimate non-discriminatory reasons for Plaintiffs' terminations; (5) that Questell and Rodriguez are entitled to qualified immunity; and (6) that Antonia Leon Alvarado, Juana Ortiz Perez, Jose Sanchez Rodriguez, Sonia Campos-Colon, and Luis Soto Santiago's claims are time-barred.

Plaintiffs opposed, arguing that they have set forth a *prima facie* case for political discrimination, and there are material issues of fact as to Defendants' proffered reason for Plaintiffs' terminations/demotions that preclude summary judgment. Plaintiffs also posit that Questell and Rodriguez are not entitled to absolute immunity. Notwithstanding, Plaintiffs assent to voluntarily dismiss their political harassment claims, except for Candida Jiménez Moreno and Cereida Muñoz's claims on this issue. Moreover, Plaintiffs concede that Antonia Leon Alvarado, Juana Ortiz Perez, Jose Sanchez Rodriguez, and Luis Soto Santiago's claims are time-barred.[3] Also, all transitory and Law 52 Plaintiffs assert to voluntarily dismiss their due process claims. Thus, pending before this Court is whether Plaintiffs pled a *prima facie* case of political discrimination, whether Cereida Muñoz and Candida Jiménez's claims for political harassment are time-barred, whether the career employees' due process claims prosper, and whether Questell and Rodriguez are entitled to qualified immunity.

---

[3] Sonia Campos-Colon claims were dismissed for failure to appear at her deposition. See Docket # 79.

**Civil No. 06-1627 (SEC)**                                                    3

---

### Standard of Review

*R. Fed. Civ. P. 56*

The Court may grant a motion for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ramírez Rodríguez v. Boehringer Ingelheim, 425 F.3d 67, 77 (1st Cir. 2005).   In reaching such a determination, the Court may not weigh the evidence.  Casas Office Machs., Inc. v. Mita Copystar Am., Inc., 42 F.3d 668 (1st Cir. 1994).  At this stage, the court examines the record in the "light most favorable to the nonmovant," and indulges all "reasonable inferences in that party's favor." Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).

Once the movant has averred that there is an absence of evidence to support the nonmoving party's case, the burden shifts to the nonmovant to establish the existence of at least one fact in issue that is both genuine and material.  Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (citations omitted).  "A  factual issue is 'genuine' if 'it may reasonably be resolved in favor of either party and, therefore, requires the finder of fact to make 'a choice between the parties' differing versions of the truth at trial.'" DePoutout v. Raffaelly, 424 F.3d 112, 116 (1st Cir. 2005)(citing Garside, 895 F.2d at 48 (1st Cir. 1990)); see also SEC v. Ficken, 546 F.3d 45, 51 (1st Cir. 2008).

 In order to defeat summary judgment, the opposing party may not rest on conclusory allegations, improbable inferences, and unsupported speculation. See Hadfield v. McDonough, 407 F.3d 11, 15 (1st Cir. 2005) (citing Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).  Nor will "effusive rhetoric" and "optimistic surmise" suffice to establish

a genuine issue of material fact.  Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997).  Once the party moving for summary judgment has established an absence of material facts in dispute, and that he or she is entitled to judgment as a matter of law, the "party opposing summary judgment must present definite, competent evidence to rebut the motion."  Méndez-Laboy v. Abbot Lab., 424 F.3d 35, 37 (1st Cir. 2005) (citing Maldonado-Denis v. Castillo Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).  "The non-movant must 'produce specific facts, in suitable evidentiary form' sufficient to limn a trial-worthy issue. . . .  Failure to do so allows the summary judgment engine to operate at full throttle." Id.; see also Kelly v. United States, 924 F.2d 355, 358 (1st Cir. 1991) (warning that "the decision to sit idly by and allow the summary judgment proponent to configure the record is likely to prove fraught with consequence."); Medina-Muñoz, 896 F.2d at 8 (citing Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)) (holding that "[t]he evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve.").

**Uncontested Facts**

Because the instant motion is for summary judgment, the parties must comply with the requirements of Local Rule 56, and file a statement of facts, set forth in numbered paragraphs, and supported by record citations. See Local Rule 56(b). In turn, when confronted with a motion for summary judgment, the opposing party must:

> [s]ubmit with its opposition a separate, short, and concise statement of material facts. The opposition shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation as required by this rule.

Local Rule 56(c). If the opposing party fails to do so, "summary judgment should, if appropriate, be entered." FED. R. CIV. P. 56(e)(2). These rules "are meant to ease the district

court's operose task and to prevent parties from unfairly shifting the burdens of litigation to the court." Cabán-Hernández v. Phillip Morris USA, Inc., 486 F.3d 1, 8(1st Cir. 2007). When the parties ignore the Local Rule, they do so at their peril. See Ruiz-Rivera v. Riley, 209 F. 3d 24, 28 (1st Cir. 2000).

In the present case, Defendant complied with Rule 56, and submitted a Statement of Uncontested Facts (Docket # 72) (hereinafter "Defendant's SUF"), numbered, and supported by record citations. In opposition, Plaintiffs filed a statement of contested material facts ("Plaintiffs' SCMF"), as well as 51 additional uncontested facts ("Plaintiffs' AUF"). Docket # 121. Defendants did not oppose Plaintiffs additional uncontested facts, and as such, this Court will deem uncontested those facts that are properly supported by the record.

Upon reviewing the record, this Court finds that the facts set forth at Defendant's SUF ¶¶ 1, 2, 14,[4] 19-23, 26, 30, 32, 39, 41-45, 49 and 52 were admitted by Plaintiffs, and as such, are deemed uncontested.[5]  However, Plaintiffs properly controverted Defendants' SUF ¶ ¶ 3, 4, 5,

---

[4]   Plaintiffs allege that although Ordinance # 28 was approved by the Municipal Assembly, the economic needs study was never submitted to the Assembly, and instead, the presentation and approval process was controlled by Reinaldo Melendez, Irma Vargas, and Rodriguez.

[5]   Plaintiffs failed to provide record citations in opposition to Defendant's SUF ¶ ¶ 6 and 16. The citation provided at Defendant's SUF ¶ 7 does not lend support to said statement, and as such, will be disregarded upon ruling on the instant motion. Moreover, Defendants' SUF ¶¶ 8 and 9 are irrelevant to the issues raised in the motion for summary judgment.

15,[6] 17,[7] 18, 25, 27,[8] 29, 34, 35, 36, 40, and 46.

Based on the foregoing, this Court finds that the following pertinent facts, are uncontested:

On November 2, 2004, General Elections were held in Puerto Rico. Defendants' SUF ¶ 1. Prior to the 2004 elections, the PDP had been in power in Santa Isabel for eight years, from 1996 to 2004. Plaintiffs' AUF ¶ 1. In the 2004 Elections, Questell ran under the insignia of the NPP, in the mayoral race for the Municipality, and defeated Angel Sánchez Bermúdez, the incumbent Mayor running for reelection under the PDP. Defendants' SUF ¶ 2. According to some of the plaintiffs' testimony, the 2004 municipal elections were heavily contested, and there was a heated political atmosphere throughout Santa Isabel. Plaintiffs' AUF ¶ 1. During this period, the NPP campaign continuously played and/or ran a musical jingle which stated "You are all

----

[6] Specifically, at SUF ¶ 15, Defendants aver that Municipal Ordinance No. 28 ("Ordinance 28") complies with the Office of the Commissioner for Municipal Affairs's ("OCAM") recommendation as to the procedural steps in the implementation of a layoff plan. However, OCAM's recommendation, included as Exhibit 11, is dated July 29, 2005, and Ordinance 28 was approved on June 27, 2005. Since the Ordinance's approval date precedes OCAM's letter, this Court cannot conclude that the Ordinance was expressly enacted in compliance with the recommendations set forth in the letter, albeit the former's content may coincidentally conform with the latter's recommendations.

[7] Although Defendants' SUF ¶ 17 proposes that, as of 2005, the Municipality lacked a system to evaluate the employees' performance, the document at Exhibit 12 shows that a system was in place since 2002. Plaintiffs also showed that some regular employees were dismissed prior to July 1, 2005, and thus their files were not reviewed in order to determine the years of service accrued by those employees.

[8] Defendants SUF ¶ 25 avers that per the Mayor's request, Rodriguez submitted a list of positions to be eliminated within each job classification, which was supposed to be based on information provided to Rodriguez by the heads of the municipality's departments, whereas Defendants' SUF ¶ 27 proposes that the Mayor did not have any involvement in these matters. However, Plaintiffs show that, pursuant to Rodriguez's deposition testimony, she did not recall if all the department heads complied with the mayor's request, and that some directors channeled the information directly to the mayor.

going out", referring to the ousting of the PDP municipal employees. Id. After Questell won the election in November 2004, the above-mentioned "jingle" continued to be played throughout Santa Isabel during the months of January, February and March, 2005. Id. at 2.  Moreover, shortly after his election, on December 16, 2004, Questell filed a *writ of mandamus* in the Commonwealth's Court, Ponce Superior Section, against Sánchez Bermúdez, and other six members of his staff, seeking to compel the transition process, as provided under the Autonomous Municipalities Act. P.R. Laws Ann. tit 21 § 4111. Defendants' SUF ¶ 3. In January 2005, the Municipality retained the services of an accounting firm, to conduct an assessment of the budgetary situation. Id. at 5.

On June 8, 2005, the Santa Isabel Municipal Legislature passed Municipal Ordinance # 28 ("Ordinance 28 "), to approve a Plan to lay off, transfer, or demote municipal employees based on the needs of the Municipality and/or the availability of municipal funds. Id. at 14. Ordinance 28 became a municipal law after Questell signed it on June 27, 2005. Id.  Said ordinance was posted in bulletin boards in each department of the Municipality. Id. at 16. On July 29, 2005, the OCAM issued Circular Letter 2005-10, defining the particular process to follow for the approval and implementation of a municipal Lay Off plan, in compliance with the Autonomous Municipal Act. Id. at 13.[9] OCAM's Circular Letter 2005-10 encouraged all municipalities to have an approved Lay Off plan, even if its implementation had not yet been decided. Id.

Questell did not have any involvement in the review of personnel files, nor participated in the draft of the lists detailing the years of services and seniority status of the career municipal employees. Id. at 19. The career employees were notified on or around of August 1, 2005, by the Human Resources Department with a written notice of his/her years of public service,

---

[9]   The document at Exhibit 11 (Docket # 72-14) is dated July 29, 2005, not June 2005.

pursuant to the personnel records reviewed.  Id. at 20. In said written notice, each employee was advised of his/her right to request within ten days, corrections with regards to the years of public service informed, and to submit the documents in support thereof. Id. Copies of the preliminary list prepared by the Human Resources Department with the information of years of public services accrued by all the municipal employees were posted in the bulletin boards of the Municipality. Id. at 21. Nineteen employees, six of them Plaintiffs in this case, requested corrections and amendments to the Human Resources Department regarding the information of his/her years of public service.  Id. at 22. After the Human Resources Department reviewed the corrections requested by said employees, an amended list with the seniority status of all the career employees was issued on or around of September 2, 2005, with the changes requested by each employee. Id. at 23. Copies of the Amended List of Seniority Status were posted in the bulletin boards at the Municipality's City Hall. Id.

On September 1, 2005, Questell gave Rodriguez written instructions to perform an evaluation of the existing positions, and to submit recommendations as to the number of job posts that could be eliminated to deter the budgetary deficit. Id. at 24.[10] On September 15, 2005, Questell sent a letter to Rodriguez, ordering the elimination of 44 positions. Id. at 26. Also in September 2005, Mayor Questell requested an updated assessment from the external financial advisors and to the Finance Director regarding the Municipality's financial status. Id. at 28. As a result of Questell's request, accountant Reinaldo Meléndez, and the Finance Director, Irma

---

[10]  Plaintiffs argue that Exhibit 20, provided in support of Defendants' SUF ¶ 24, does not mention "without affecting the provision of services." Upon reviewing the record, this Court finds that the document at Exhibit 20 does not include said wording. As such, that portion will be disregarded by this Court.

**Civil No. 06-1627 (SEC)**                                                                     9

Vargas ("Vargas"), issued on October 5, 2005 a "Transition Report" stating the Municipality's financial status after the closing of FY 2004-2005. Id. at 6[11] and 28.

The Transition Report listed, among others, the following findings about the municipality's fiscal status: that 82% of the municipal budget for FY 2004-2005 was compromised for payroll and fringe benefits of the municipal employees, leaving only 18% of the budget to render services to citizens and permanent public works, more than 50% of the operational budget for that fiscal year had been spent by the outgoing administration, despite the fact that it was an electoral year, that the revenues had been grossly overestimated while the expenses were underestimated, and that the operational budget of the Municipality would increase to $15 million. Id.

According to the audits performed by the PR Comptroller's Office, the Municipality had the following accumulated budgetary deficits in the previous fiscal years: $3,482,841 in 2000-01; $4,921,762 in 2001-02; $3,557,466 in 2002-03; $3,832,308 in 2003-04; $7,261,639 in 2004-05; $6,062,699 in 2005-06; and $3,278,031 in 2006-07. Id. at 10.[12] According to the latest audit performed by the PR Comptroller's Office in the Municipality, the accumulated deficits reflected for the last fiscal four years represent the following percentages of the municipal budgets 45%, 83%, 75%, and 41%, respectively. Id. at 11.[13] The audits conducted by the PR Comptroller's Office also reflect that for FY 2004-05, the number of municipal employees -thus

---

[11] This Court notes that albeit Defendants state that the Transition Report is dated February 15, 2009, the document provided in support of said statement shows that the report is dated October 5, 2005. Moreover, this Court will consider the exact wording provided in said report.

[12] Plaintiffs note that the information therein cited refers to "accumulated deficits."

[13] Plaintiffs note that Exhibit 8, cited at Defendants' SUF ¶ 11, also shows that the Municipality's ordinary expenses and public debt increased during the 2005-2006, and 2006-2007 fiscal years.

the payroll costs and fringe benefits- also reached its highest scores in six years. Id. at 12. However, the non-professional employees and contractors' salaries are not included in said amounts, since they were not considered as Municipality employees. Id. The most recent audit also shows a deficit reduction achieved mainly in the FY 2006-2007. Id. at 37.

On October 17, 2005, the Santa Isabel Municipal Legislature approved Municipal Ordinance No. 21 (Series 2005-2006), to amend sections 7 and 10 of Municipal Ordinance (Series 2004-2005). Pursuant to that amendment, other financial alternatives to be evaluated by the Municipality in order to avoid laying off employees, would be available only if considered viable under the financial constraints endured by the Municipality. Id. at 30. On October 18, 2005, when news of the imminent dismissals of the PDP career employees spread throughout the Santa Isabel City Hall, a group of PDP affiliates and employees, including many of the plaintiffs in this case, gathered in front of City Hall to protest the imminent dismissals. Plaintiffs' AUF ¶ 3. While the multitude gathered outside of City Hall, several of the PNP employees that remained working inside laughed at, and mocked the crowd outside. Id. On even date, written layoff notices were handed to certain municipal career and transitory employees. Defendants' SUF ¶ 31.[14] Pursuant to the terms of the notice, the layoff would become effective after 30 days from receiving the letter. Id. The letter also advised all discharged employees about their right to appeal their dismissal to the Puerto Rico Appellate Commission of the Human Resources System (known as "CASARH" for its Spanish language acronym). Id. at 32. Nineteen career employees laid off on November 2005 filed an appeal before CASARH. Id. at 32. Three of the employees laid off on November 2005 were offered posts under Law 52 contracts that became vacant that same month. Id. at 33.

---

[14]  This proposed fact is partially admitted by Plaintiffs. However, there is controversy as to the specific amount of employees that were served the written layoff notice.

According to Questell's July 23, 2008 deposition testimony, he did not know how many employees worked for the municipality during fiscal years 2005, 2006, 2007 and 2008. Plaintiffs' AUF ¶ 7. He pointed out that Rodriguez, as Human Resources Director, knows the amount of municipal employees. Id. at 8.  However, Questell declared that, after June 30, 2005, the Municipality hired and/or appointed employees. Id. at 27. Moreover, he does not recall whether the Municipality instituted a hiring freeze when the layoff plan was being carried out. Id. at 26.

*Natalie Rodriguez, Human Resources Director*

Natalie Rodríguez Cardona began as the Human Resources Director in February 2005. Defendants' SUF ¶ 41; Plaintiffs' AUF ¶ 9. Before February 2005, Rodriguez never worked for, nor occupied any position with the Municipality. Defendants' SUF ¶ 41. Rodríguez is not a political activist, nor has she been in the past; her involvement in politics has been limited to serving in the 2000 General Elections as a polling station volunteer for the NPP at a school in Santa Isabel. Id. at 42. Before becoming the Human Resources Director, Rodriguez had only personally met very few of the Plaintiffs in the context of her immediate prior work as a teller in a Coop Bank in Santa Isabel. Id. at 43.

According to Rodriguez, she did not have any personal involvement in the final decision taken in regards to the job posts and classifications to be eliminated, since her participation was limited to providing, through a letter dated September 12, 2005, the information gathered from the directors of the municipal departments as to the number of positions needed in each work unit. Id. at 44. Rodríguez did not have any personal involvement in the decision not to renew any of Plaintiffs' contracts. Id. at 45. During her tenure as Human Resources director, Rodriguez never received written instructions stating that there was a hiring freeze at the

Municipality, and she did not have any knowledge that positions were frozen in 2005. Plaintiffs'
AUF ¶ 11.

*Ana Cora Silva*

Ana Cora Silva was a transitory employee working at the Community Development
Block Grant Federal HUD program, as a Labor Regulations Technician. Plaintiffs' AUF ¶ 36.
Cora and Nitza Sánchez Rodríguez prepared the HUD Federal Proposal for the fiscal year 2005-
2006 (October 1 to September 30). Id. at 37. When HUD approved said proposal, it included
both of these plaintiffs' names as employees, and later both names were crossed out by
supervisor Edwin Rodríguez and Questell. Id. Luz Yahaira Pabón, a PNP affiliate at that time,
became the Labor Standards Technician. Id.

*Angel Febus*

Angel Febus held the career position of Recycling Coordinator. Id. at 40. Febus was a
political activist of the PDP, and Questell recognized him as such. Id. at 42.  Febus led a PPD
protest-rally in October 2005 in front of City Hall. Id. at 44. He was also a delegate of
AEELA.[15] Id. at 43.  During a meeting with Questell, held on August 18, 2005, Febus requested
that the Municipality pay AEELA the remittances owed for its employees. Id. The
Municipality's failure to pay said remittances prompted him to file an injunction before the
Ponce Court. Id.

**Applicable Law and Analysis**

*Political Discrimination Claims*

The Supreme Court has held that Section 1983 in itself does not confer substantive
rights, but provides a venue for vindicating federal rights elsewhere conferred. See Graham v.

---

[15] Spanish acronym for "Asociación de Empleados del Estado Libre Asociado", meaning
Association of the Employees of the Commonwealth.

**Civil No. 06-1627 (SEC)**                                                    13

M.S. Connor, 490 U.S. 386, 393-94 (1989). In the instant case, Plaintiffs' Section 1983 claims are based on alleged violations of the First Amendment. In order to prove liability under Section 1983, "plaintiffs must show by a preponderance of the evidence that: (1) the challenged conduct was attributable to a person acting under color of state law; and (2) the conduct deprived the plaintiff of rights secured by the Constitution or laws of the United States." Id. (citing Velez-Rivera v. Agosto-Alicea, 437 F.3d 145, 151-52 (1st Cir. 2006). "While plaintiffs are not held to higher pleading standards in section 1983 actions, they must plead enough for a necessary inference to be reasonably drawn." Marrero, 491 F. 3d at 10. Moreover, when alleging political discrimination under Section 1983, plaintiffs must produce evidence that partisanship was a substantial or motivating factor in the adverse employment action. See Maymi v. P.R. Ports Authority, 515 F.3d 20, 25 (1st Cir. 2008).

The First Circuit has held that "[t]he right to associate with the political party of one's choice is an integral part of the basic constitutional freedom to associate with others for the common advancement of political beliefs and ideas protected by the First Amendment." Carrasquillo v. Puerto Rico, 494 F.3d 1, 4 (1st Cir. 2007) (citing Kusper v. Pontikes, 414 U.S. 51, 56-57 (1973)). As a general rule, "the First Amendment protects associational rights... [and] the right to be free from discrimination on account of one's political opinions or beliefs." Galloza v. Foy, 389 F. 3d 26, 28 (1st Cir. 2004). Since public employees "generally enjoy protection from adverse employment actions based on their political affiliations," this Circuit has held that "a government employer cannot discharge public employees merely because they are not sponsored by or affiliated with a particular political party." Id.; see also Maymi, 515 F.3d at 25; Carrasquillo, 494 F.3d at 4 (citing Branti v. Finkel, 445 U.S. 507, 517-19, 100 S. Ct.

1287, 63 L. Ed. 2d 574 (1980)).[16] This protection extends to career employees, trust employees, transitory employees, and independent contractors.  Martinez-Baez v. Rey-Hernandez, 394 F. Supp. 2d 428, 434 (D.P.R. 2005) (citing Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 98 (1st Cir. 1997)); see also O'Hare Truck Serv., Inc. v. City of Northlake, 518 U.S. 712 (1996).

The First Amendment's protection against political discrimination also extends to adverse employment actions short of dismissal; that is, "promotions, transfers and recalls after layoffs based on political affiliation or support are an impermissible infringement on the First Amendment rights of public employees." Rutan v. Republican Party, 497 U.S. 62, 75 (1990). Furthermore, it "includes changes in employment, which, although not as extreme as dismissal, result in working conditions 'unreasonably inferior' to the norm for the position at issue." Carrasquillo, 494 F.3d at 4 (citations omitted). Thus the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests- especially his interest in freedom of speech[; for] if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to produce a result which it could not command directly." Rutan, 497 U.S. at 72.

Political discrimination claims must be reviewed through a burden-shifting scheme: the plaintiff must first show that "he engaged in constitutionally protected conduct, and that this conduct was a substantial or motivating factor for the adverse employment decision." Mt. Healthy v. Doyle, 429 U.S. 274, 287 (1977) (superseded on different grounds);  Carrasquillo, 494 F.3d at 4; Padilla v. Rodríguez, 212 F. 2d 69, 74 (1st Cir. 2000). Thus in order to establish a *prima facie* case of political discrimination, a plaintiff must demonstrate "that party affiliation

---

[16]   The First Amendment also protects against other adverse employment actions, such as demotions. See Marrero v. Molina, 491 F. 3d 1 (1st Cir. 2007).

was a substantial or motivating factor behind a challenged employment action." Marrero, 491 F. 3d at 9. The First Circuit has held that a plaintiff must first "make four showings": (1) that the plaintiff and the defendant belong to opposing political affiliations; (2) the defendant has knowledge of the plaintiff's opposing political affiliation; (3) there is a challenged employment action; and (4) there is sufficient direct or circumstantial evidence that political affiliation was a substantial or motivating factor in defendant's decision. Peguero-Moronta v. Santiago, 464 F.3d 29, 48 (1st Cir. 2006) (internal citation and quotation omitted); see also Monfort-Rodriguez v. Rey-Hernandez, 599 F. Supp. 2d 127, 168 (D.P.R. 2008).

When the plaintiff satisfies this initial burden, the burden then shifts to the defendant to show that "it would have taken the same action regardless of the plaintiff's political beliefs-commonly referred to as the Mt. Healthy defense." Padilla, 212 F. 2d at 74; Carrasquillo, 494 F.3d at 4; Torres-Martinez v. P.R. Dept. Of Corrections, 485 F.3d 19, 23 (1st Cir. 2007); Rodríguez-Ríos v. Cordero, 138 F. 3d 22 (1st Cir. 1998). That is, the defendants must "demonstrate that (i) they would have taken the same action in any event; and (ii) they would have taken such action for reasons that are not unconstitutional." Velez-Rivera v Agosto-Alicea, 437 F.3d 145, 152 (1st Cir. 2006) (citing Mt. Healthy, 429 U.S. at 286-87). If the defendant makes such a showing, the plaintiff may attempt to discredit the tendered nondiscriminatory reason with either direct or circumstantial evidence. Id. at 153. In determining the sufficiency of Plaintiffs' evidence, the First Circuit has held that although a highly charged political atmosphere alone cannot support an inference of discriminatory animus, when coupled with "the fact that plaintiffs and defendants are of competing political persuasions, may be probative of discriminatory animus." Rodríguez-Ríos, 138 F. 3d at 24. Notwithstanding, political discrimination claims always require "that defendants have knowledge of the plaintiffs[']

political affiliation." <u>Martinez-Baez</u>, 394 F. Supp. 2d at 434; <u>Hatfield-Bermudez v. Aldanondo-Rivera</u>, 496 F.3d 51, 61-62 (1st Cir. 2007).

In their motion for summary judgment, Defendants aver that Plaintiffs have failed to establish a *prima facie* case of political discrimination. Specifically, they aver that Plaintiffs have not shown that Questell and Rodriguez knew all of Plaintiffs' political affiliations. As to Rodriguez, Defendants contend that she did not know any of the Plaintiffs' herein political affiliation. However, they concede that Questell personally knows 24 of the Plaintiffs, and is aware that said plaintiffs are PDP affiliates. Defendants further contend that the evidence set forth by Plaintiff is insufficient to raise their claims above the speculative level, that is, to establish a causal link between the adverse employment action and the alleged discriminatory animus. According to Defendants, Plaintiffs' allegations that Defendants knew about their political affiliation because they participated as election officials during elections, and attended political rallies as PDP members have been rejected by this Circuit. Notwithstanding, Defendants also proffer a legitimate non-discriminatory reason for the employment actions taken against Plaintiffs. Specifically, they argue that the Lay Off Plan was implemented due to the Municipality's financial crisis, and was not politically motivated. Thus Defendants posit that they would have taken the same action in any event for non-discriminatory reasons.

In opposition, Plaintiffs argue that the Layoff Plan, implemented through Ordinance 28, was hastily approved, without prior studies and recommendations regarding the alleged financial crisis. They further note that although Ordinance 28 provides five alternatives to be considered prior to dismissal, that is, re-assignment of personnel, re-training of employees, leave without pay, reduction of working hours, and demotions, per Rodriguez admission, these were never offered to Plaintiffs prior to their dismissals. Plaintiffs also contend that the fact that seniority was only considered within each job classification negated the senior employees'

rights. Plaintiffs aver that albeit Ordinance 28 was subsequently amended on October 2005, all employees that were terminated between June 30 and October 2005 were entitled to the above-mentioned alternatives. Notwithstanding, Plaintiffs posit that the day after Ordinance 28 was amended, most of the plaintiffs received their termination letters.  According to Plaintiffs, the 2004 elections were hotly contested, and this led to politically motivated employment actions. Moreover, they argue that despite the Municipality's alleged financial crisis, it continued to hire new employees in 2005, 2006, 2007, and 2008. They also point out that the Municipality's regular expenses, and public debt increased during fiscal years 2005-2006, and 2006-2007. Based on the foregoing, Plaintiffs argue that Defendants' Mt. Healthy defense is pre-textual.

In the present case, there is no controversy as to the fact that Plaintiffs and Defendants belong to opposing political affiliations, and that there is a challenged employment action. Thus this Court's analysis hinges on whether Defendants knew about Plaintiff's opposing political affiliation, and whether there is sufficient direct or circumstantial evidence that political affiliation was a substantial or motivating factor in Defendants' decision.

Per the uncontested facts, Questell admits that he could not discard knowing many of the plaintiffs by their nicknames, since he may recognize them if he sees them in person, even though he may not know their full names. Plaintiffs' AUF ¶¶ 7 and 25. Notwithstanding, as of 2005, he admittedly knew the following Plaintiffs by name: Angel Febus Rodríguez, Eugenio Reyes Alomar, Emma Espada Soto, Julio Espada Soto, Alma Jusino, Alma Mora, Cereida Muñoz, Farelyn Torres Colón, Karen Soldevila Muñoz, Luis Ithier Correa, Zasha Martínez Palermo, Ravindranas Laboy, Candida Jiménez,Angelita Rodríguez Colón, Héctor Rivera, Benoni Vega Suárez, Evelyn Leandry, Pablo Torres Rodríguez, Evelyn Rivas, Leslie Rentas, Sonia Campos, Ana Cora and Carlos Hernández Alvarado, Silverio Cruz, and Angelo Pedroso.

Defendant's SUF at 38. He also knew that said Plaintiffs are PPD affiliates. Id. at 39. Moreover, Plaintiffs showed that Questell knew Lourdes Romero was affiliated with the PDP.  Id. at 49.[17]

As to the remaining Plaintiffs, after reviewing the record, this Court finds that although Questell admits that he could not discard knowing many of the plaintiffs by their nicknames or full names, Plaintiffs have not shown that Defendants knew each Plaintiffs' political affiliation. The First Circuit provides that "[a] prima facie case is not made out when there is no evidence that an actor was even aware of the plaintiff's political affiliation." Hatfield-Bermudez, 496 F.3d at 61. In fact, in Gonzalez-Di Blasini v. Family Dep't., 377 F.3d 81, 85-86 (1st Cir. 2004), this Circuit upheld the district court's granting of defendants' motion for summary judgment, upon finding that plaintiff failed to show that the defendants knew about her political affiliation. The Court stated that the fact that plaintiff was a well-known supporter of the opposing party, had held previous trust positions under said party's administration, and that was allegedly demoted after they assumed power, was insufficient to show that defendants knew about her political affiliation, and that said affiliation was the motivating factor for her demotion.  Id.; see also Cosme-Rosado v. Serrano-Rodriguez, 360 F.3d 42, 48 (1st Cir. 2004) (finding that a PDP Mayor's statement that he intended to "rid the town of NPP activists" was not enough to show that political affiliation was motive for adverse employment action); Acevedo Díaz v. Aponte, 1 F.3d 62, 69 (1st Cir. 1993) (holding that the fact that plaintiffs were conspicuous targets for discriminatory employment action by defendants because they prominently supported a former mayor is not enough to show motive).

---

[17] Lourdes Romero, a PDP affiliate, worked at the Municipality until July 31, 2005. Plaintiffs' AUF ¶ 49. Questell knew her personally, as well as her political affiliation. Id.  After winning the candidacy for the mayor's position, Questell told Romero he was going to make her switch parties from the PDP to the PNP. Id.

Similarly, this district recently granted a municipality defendant's motion for summary judgment, holding that "none of the plaintiffs, except [a specified few] offer[ed] evidence that [defendant] had first-hand knowledge of their affiliations" with the opposing party. Díaz-Ortiz v. Díaz-Rivera, 611 F. Supp. 2d 134, 144 (D.P.R. 2009)(citations omitted); see also Roman v. Delgado-Altieri, 390 F. Supp. 2d 94, 102 (D.P.R. 2005)(citing Aviles-Martinez v. Monroig, 963 F.2d 2, 5, (1st Cir. 1992)). The court further noted that "even when circumstantial evidence may be sufficient to support a finding of political discrimination, plaintiffs must still make a fact-specific showing that a causal connection exists between the adverse employment action and their political affiliation." Id. (citations omitted); see also Monfort-Rodriguez v. Rey-Hernandez, 599 F. Supp. 2d 127 (D.P.R. 2008).

The fact that the plaintiffs were municipal employees under the previous administration does not constitute evidence of their political affiliation. Hatfield-Bermudez, 496 F.3d at 62. This Circuit has also held that even when a plaintiff is a well-known supporter of a different political party, this may not suffice to show that a challenged employment action is premised on political affiliation. Gonzalez-De Blasini v. Family Dep't., 377 F.3d 81, 85-86 (1st Cir. 2004). Also,

> a plaintiff cannot prove that the defendant had knowledge of his political affiliation merely through: testimony of having been seen, or, for that matter, met during routine campaign activity participation, having been visited by the now incumbent while said defendant was a candidate to the position he now holds, by having held a trust/confidential/policymaking position in the outgoing administration, by having political propaganda adhered to plaintiff's car and/or house, or throught knowledge of third parties.

Roman, 390 F. Supp. 2d at 102-03. Furthermore, mere temporal proximity between an adverse employment action and a change of administration is insufficient to establish discriminatory animus. Acevedo-Díaz v. Aponte, 1 F.3d 62, 69 (1st Cir. 1993).

As in <u>Gonzalez -De Blasini</u>, 377 F.3d 81, 86, the Court recognized that a *prima facie* case for political discrimination may be built on circumstantial evidence. That is, a plaintiff "need not produce direct evidence of discriminatory treatment (a so-called 'smoking gun') to establish a prima facie case of politically discriminatory demotion [or termination]." <u>Aguiar-Carrasquillo v. Agosto-Alicea</u>, 445 F.3d 19, 26 (1ˢᵗ Cir. 2006). However, most Plaintiffs in this case have not "generated 'the specific facts necessary to take the asserted claim out of the realm of speculative, general allegations" regarding Defendants' knowledge of their political affiliation. <u>Gonzalez -De Blasini</u>, 377 F.3d at 86. The fact that Questell, in his deposition testimony, stated that he may recognize some of Plaintiffs' faces, does not equate knowledge of their political affiliations. Therefore Plaintiffs' proposition is speculative, and insufficient to satisfy the *prima facie* case standard. <u>See</u> *cf.* <u>Aponte-Santiago v. Lopez-Rivera</u>, 957 F.2d 40, 43 (1ˢᵗ Cir. 1992) (finding that plaintiff's sworn statement that defendants knew his political affiliation is enough  to satisfy the *prima facie* case requisite); <u>Rodriguez-Rios v. Cordero</u>, 138 F.3d 22, 24 (1ˢᵗ Cir. 1998) (holding that the district court erred in granting summary judgment when the plaintiff proffered evidence showing that her PDP affiliation was widely known, and that defendants were aware of her political affiliation); <u>Monfort-Rodriguez v. Rey-Hernandez</u>, 504 F.3d 221, 225-226 (1ˢᵗ Cir. 2007) (holding that although plaintiffs did not produce direct evidence that Rey was aware of their political affiliation, there was enough circumstantial evidence - Rey and the human resource personnel's deposition testimony - to render the case more circumstantial than speculative).

Accordingly, if Defendants did not know Plaintiffs' political affiliation, said factor could not have been a substantial motivating factor for any adverse employment action.  As a result, this Court finds that most Plaintiffs have "not met the burden of showing that [their] political affiliation was a substantial or motivating factor for the challenged employment action[s]." <u>Id.</u>

**Civil No. 06-1627 (SEC)**                                               21

---

Based on the foregoing, all Co-Plaintiffs, except Angel Febus Rodríguez, Eugenio Reyes Alomar, Emma Espada Soto, Julio Espada Soto, Alma Jusino, Alma Mora, Farelyn Torres Colón, Karen Soldevila Muñoz, Luis Ithier Correa, Zasha Martínez Palermo, Ravindranas Laboy, Angelita Rodríguez Colón, Héctor Rivera, Benoni Vega Suárez, Evelyn Leandry, Pablo Torres Rodríguez, Evelyn Rivas, Leslie Rentas, Ana Cora, Carlos Hernández Alvarado, Silverio Cruz, Angelo Pedroso, and Lourdes Romero's political discrimination claims are **DISMISSED with prejudice**.

However, this Court must also determine whether the remaining Plaintiffs have sustained their initial burden to show that the last requisite of the four prong test is met, that is, that their political affiliation was the motivating or substantial factor behind the alleged adverse employment action. In the present case, Plaintiffs have shown that there was a highly charged political environment. Pursuant to the uncontested facts, the 2004 municipal elections were heavily contested, and there was a heated political atmosphere throughout Santa Isabel. Plaintiffs' AUF ¶ 1. In addition to the fact that the NPP campaign continuously played and/or ran a musical jingle which stated "You are all going out" from November 2004 through March 2005 (Plaintiffs' AUF ¶ 2), shortly after his election, en December 16, 2004, Questell filed a *writ of mandamus* in the Commonwealth's Court, Ponce Superior Section, against mayor Sánchez Bermúdez, and other six members of his staff, seeking to compel the transition process. Defendants' SUF ¶ 3. Moreover, on October 18, 2005, a group of PDP affiliates and employees, including many of the plaintiffs in this case, gathered in front of City Hall to protest their dismissals, and several of the PNP employees that remained working inside laughed at, and mocked the crowd outside. Plaintiffs' AUF ¶ 3.

In political discrimination cases, "[a] highly charged political atmosphere whereby one party takes over power from another, combined with the fact that the plaintiff and defendant are

of opposing parties may be probative of discriminatory animus." <u>Pagan-Cuebas v. Vera-Monroig</u>, 91 F. Supp. 2d 464, 474 (D.P.R. 2000). Also, "factors that have been found to show discriminatory animus include the fact that the plaintiff was a known member of the opposing party, that the position was then filled by a member of the opposite political party, and that everyone of the plaintiff's party was demoted after a change in office." <u>Flores-Camilo v. Alvarez-Ramirez</u>, 283 F. Supp. 2d 440, 448 (D.P.R. 2003). Courts must determine whether "the circumstantial evidence, taken as a whole, gives rise to a plausible inference or discriminatory animus which, ultimately possesses enough convictive force to persuade a rational fact-finder that the defendants' conduct was politically motivated?" <u>Id.</u> In this case, this Court finds in the affirmative.

Although Defendants proffer a *Mt. Healthy* defense, arguing that the 2005 Lay Off Plan that led to Plaintiffs' terminations was implemented exclusively due to the Municipality's financial crisis, the record shows that pursuant to Rodriguez's testimony, when she started to work in said position, the Municipality had "more or less three hundred fifty (350) employees, and as of July 24, 2008, the Municipality had over four hundred (400) employees." Plaintiffs' AUF ¶ 9. She also stated under oath that "at certain times" there have been increases in the number of employees at the municipality year by year. <u>Id.</u> Questell also declared that, after June 30, 2005, the Municipality hired and/or appointed employees. <u>Id.</u> at 27. Specifically, the Municipality hired new employees as office clerks to substitute PDP followers, such as Gerardo Márquez, who held a trust position. <u>Id.</u>

Moreover, pursuant to a certification dated December 15, 2006 by Rodríguez, the Municipality contracted 168 persons through Law 52 funds during fiscal year 2005-2006, despite allegations that the Law 52 Plaintiffs' contracts were not renewed due to lack of funds. <u>Id.</u> at 38. Although all Law 52 Plaintiffs remained working until the expiration date of their

work contract, none of the law 52 employees in the municipality's roster of January 2005 were extended new contracts. Plaintiffs' AUF ¶ 24; Defendants' SUF ¶ 49. Albeit as of July 1, 2005, there were no funds approved by the P.R. Department of Labor and Human Resources ("DHLR") for Law 52 jobs in the Municipality, on March 14, 2005 the Municipality through Questell, completed a Law 52 Proposal seeking funds from the DHLR, for the fiscal year commencing July 1, 2005 and terminating on June 30, 2006. Plaintiffs' AUF ¶ 50; Defendants' SUF ¶ 50. The contract for a new Law 52 proposal was signed between the Municipality and the DLHR on July 29, 2005, with a commencement date of July 19, 2005. Defendants' SUF ¶ 51; Plaintiffs' AUF ¶ 51. Thus as of June 30, 2005, Evelyn Rivas and Leslie Rentas' contract expiration date, the Law 52 proposal had been submitted, and was awaiting approval. Despite the foregoing, Rodríguez admits that during 2005 she did not request any advice from the DHLR regarding the continuing employment of Law 52 employees. Plaintiffs' AUF ¶ 22. Furthermore, the letters sent by Mayor Questell to the Law 52 employees did not indicate the reason why they were not being re-hired had to do with an impediment in Law 52. Id. at 23. Moreover, Angelo Pedroso, and Ravindranas Laboy's contracts were terminated on November 18, 2008, that is, after the approval of the 2005 Law 52 proposal. Thus, despite the alleged fiscal crisis, the Municipality continued to hire new employees throughout 2005, 2006, 2007, and 2008. Id. at 6. Furthermore, Plaintiffs note per Exhibit 8, cited at Defendants' SUF ¶ 11, the Municipality's ordinary expenses and public debt increased during the 2005-2006, and 2006-2007 fiscal years.

Additionally, according to the uncontested facts, the Municipality's federally funded Child Care Program's proposal, which had been submitted for approval by the end of July, 2005, was discarded because Questell closed the Child Care Center during the month of August, 2005. Id. at 41. However, the Child Care Program was re-opened in September, 2005, and NPP

employees were hired to work in the same capacity as the former employees. Id.  Moreover,
according to the testimony of PDP Santa Isabel Assemblyman Justo Torres Morales, as of May
2005 there were a total of 380 municipal employees and, as of October, 2008, there were one
thousand seventy (1,070) employees at the municipality, the majority being of the PNP working
under professional service contracts. Id. at 10. Also, Luz Yahaira Pabón, a PNP affiliate at that
time, became the Labor Standards Technician, after Ana Cora was dismissed from said position.
Id. at 37.

Lastly, pursuant to Rodriguez's deposition testimony, Ordinance 28's alternatives of
reducing the work schedule, leave without pay, retraining, reduction in salary/demotion, re-
assignment, re-training,  for the municipal employees instead of dismissal  was not offered to
Plaintiffs not implemented by the Municipality. Id. at 12-21.  Rodríguez further stated that she
does  not  know  why  said  alternative  was  not  implemented.   She  also  admitted  that  the
Municipality did not evaluate the employees' efficiency. Id. at 16.

As a result, this Court finds that Plaintiffs have properly shown that material issues of
fact remain as to whether Defendants' actions were motivated by the alleged financial crisis,
or by Plaintiffs' political affiliation.

In summary, based on the uncontested facts, the remaining Plaintiffs have made out a
*prima facie* case of political discrimination. Although Defendants proffer a legitimate non-
discriminatory reason for their actions, Plaintiffs have raised material issues of fact as to the
validity of Defendants' defense.  Considering that the defense of lack of discriminatory animus
is a question of fact better left for a jury to decide, Defendants' request for summary judgment

**Civil No. 06-1627 (SEC)**                                                    25

of the remaining Plaintiffs' political discrimination claims is **DENIED.** See Orraca-Figueroa v. Torres-Torres, 288 F. Supp. 2d 176, 185 (D.P.R. 2003).[18]

*Candida Jiménez and Cereida Muñoz's Political Harassment Claims*

In their motion for summary judgment, Defendants argue that Plaintiff's political harassment claims are time-barred.[19] Although most Plaintiffs concede to the dismissal of their political harassment claims, Cereida Muñoz and Candida Jiménez argue that their claims on this front are not time-barred. According to Defendants, Jiménez and Muñoz were not included as plaintiffs in the Complaint filed on June 22, 2006, and albeit they appear as plaintiffs in the October 11, 2006 Amended Complaint, they did not assert any claims therein. Defendants further aver that insofar as Jiménez and Muñoz stated their "short of dismissal claims" for the first time in the October 2007 Second Amended Complaint, any event that occurred prior to October 2006 is time-barred.

Upon reviewing the record, this Court notes that, in the October 25, 2007 Second Amended Complaint, Jiménez and Muñoz set forth "short of dismissal" causes of action, arguing that they were deprived of their duties due to their political affiliation.[20] Under "short of dismissal" actions, plaintiffs must satisfy a two prong test, that is, they must show that the removal of their duties was motivated by their political affiliation, and that the challenged

---

[18] This Court notes that although Defendants assert that five of the career employees laid off on November 2005 were offered posts under Law 52 contracts that became vacant that month, and Plaintiff counters that only 3 were extended said offers, both parties fail to point out which Plaintiffs were offered Law 52 positions, and if they are currently working at the Municipality. Defendants' SUF ¶ 33. Thus controversy remains as to this issue.

[19] They also posit that their claims insufficient under Bell Atlantic Corp. v. Towmbly, 550 U.S. 544, 562-563 (2007). However, this Court denied the Municipality's motion to dismiss on these grounds because controversy remained as to Plaintiffs' claims date of accrual. This issue is now addressed under the summary judgment standard.

[20] They are both are currently employed by the Municipality.

actions resulted in a work environment "unreasonably inferior" to the norm for the position. Roman v. Delgado-Altieri, 390 F. Supp. 2d 94, 104 (D.P.R. 2005). In analyzing the "unreasonably inferior" prong, courts shall determine whether "the governments's actions are sufficiently severe to cause reasonably hardy individuals to compromise their political beliefs and associations in favor of the prevailing party." Id. (citing Agosto-De Feliciano v. Aponte-Roque, 889 F.2d 1209, 1217 (1ˢᵗ Cir. 1989).

Since Section 1983 lacks an accompanying federal statute of limitations, courts have applied the state's statute of limitations for personal injury cases. Gonzalez Garcia v. P.R. Elec. Power Auth., 214 F. Supp. 2d 194, 199-200 (D.P.R. 2002); Rivera-Torres v. Ortiz-Velez, 306 F. Supp. 2d 76, 82 (D.P.R. 2002). In Puerto Rico, a one-year statute of limitations governs personal injury actions. See 31 L.P.R.A. § 5298(2) (1991). Therefore, the one-year limitation period is applicable to Plaintiffs' Section 1983 claims. Gonzalez Garcia, 214 F. Supp. 2d at 199-200. Said period accrues "when the plaintiff knew or had reason to know the injury." Id. at 200 (citing Benitez Pons v. P.R., 136 F.3d 54, 59 (1ˢᵗ Cir. 1998)). In employment discrimination claims, "limitations period normally start to run when the employer's decision is made and communicated to the affected employee." Id. Therefore this Court must determine when Jiménez and Muñoz's claims' statute of limitations began.

*Candida Jiménez*

Pursuant to the record, on March 16, 1990, Jiménez became a career employee at the Municipality. Plaintiffs' AUF ¶ 28. On August 10, 2006, Questell sent her a letter whereupon she was transferred from her position as Secretary 3 at the Human Resources Department to the Police Commissioner's Office, effective August 17, 2006. Id. at 30. In said letter, Jiménez was not informed of her right to request an informal hearing prior to the effective date of her transfer. Id. at 31. When Jiménez began to work at the Municipal Police Commissioner's Office, she was immediately stripped of her duties. Id. at 33. She complained to her supervisor (the

Police Commissioner), and to Rodríguez as to her reduced duties at her current position at the Police Commissioner's Office. Id. at 34.

Thus pursuant to the above-mentioned facts, Jiménez learned about the alleged adverse employment action, that is, the deprivation of her duties, since the day she began to work at the Police Commissioner's office in August 2006.[21]  However, the Second Amended Complaint was filed on October 25, 2007, well over a year after her transfer and, the alleged deprivation of her duties. Jiménez attempts to salvage her claims arguing that the claims raised in the October 2007 Second Amended Complaint relate back to the October 2006 Amended Complaint. However, upon reviewing the October 2006 Amended Complaint, this Court notes that Jiménez does not assert any claims of political harassment, or alleges that she was deprived of her duties. Jiménez merely appears in her capacity as a career employee. It cannot be determined, from the face of the October 2006 Amended Complaint, whether Jiménez was terminated or was still employed by the Municipality. All of the 2007 Second Amended Complaint allegations of politically motivated terminations are inapplicable to Jiménez, and Muñoz, since they were still employed by the Municipality.  As a result, the political harassment claims set forth in the Second Amended Complaint do not relate back to the October 2006 Amended Complaint, insofar as the claim asserted in the latter does not arise from the same conduct set forth in the former. See FED. R. CIV. P. 15(c)(2).

Moreover, Jiménez has not shown that any additional discrete acts of political harassment occurred after August 2006. This district has held that a plaintiff's "alleged deprivation of duties . . . [is] discrete in nature," and that it is "not actionable under the continuing violation theory."

---

[21] The record is devoid of additional information regarding the duties she performed prior to her transfer. Per Jiménez's deposition testimony, her duties at the Police Commissioner's office were reduced to preparing transmittal sheets. Additionally, although at Plaintiffs' AUF ¶ 29, they allege that Questell ordered Rodriguez to remove Jiménez's telephone and fax, page 20 cited in support thereof is missing from the record.

**Civil No. 06-1627 (SEC)**                                                      28

---

Díaz-Ortiz v. Díaz-Rivera, 611 F. Supp. 2d 134, 142 (D.p.R. 2009); Rivera-Torres v. Ortiz-Velez, 306 F. Supp. 2d 76, 82 (D.P.R. 2002).  Since Jiménez alleges a deprivation of her duties upon her transfer, said case law is controlling here.[22]  Therefore, Jiménez's claims of political harassment/ "short of dismissal" are time-barred, and as a result, are **DISMISSED with prejudice.**

*Cereida Muñoz's Political Harassment Claims*

Per the record, Muñoz was known to Questell as a PDP follower and member. Plaintiffs' AUF ¶ 45. As pre-intervention officer for the Municipality, she received many contracts submitted for payment that did not have the invoices, particularly for non-professional services and suppliers. Id. at ¶ 46. Notwithstanding the lack of invoices, Vargas allowed their payment Id. As a result thereof, Muñoz sent a letter on July 12, 2005 to Finance Director Vargas, and Questell, stating that if she did not receive the needed documents - invoices - she would not preintervene any disbursement voucher. Id. at 45 and 47. Because of Muñoz's refusal to pre-intervene and approve disbursement vouchers that were not accompanied by the required documents, Vargas addressed to Muñoz a series of memoranda in November 2005 stating the alleged appropriate procedure for the approval of the disbursement vouchers. Id. Due to the foregoing, Muñoz reported to the State Insurance Fund and the Pan American Hospital for psychological treatment. Id. Questell and Vargas took away Muñoz's, and other PDP followers employed in the Finance Department's, telephone extensions and/or phones, and did not allow them to use their cellular phones while at work. Id. Muñoz's workload was reduced as of January 31, 2008. Id. at 47 and 48.

---

[22]  Even if the continuing violation doctrine applied, Jiménez failed to properly argue, and proffer evidence, showing that there is a continuing violation.  In order to establish a continuing violation under Section 1983, "a plaintiff 'must allege that a discriminatory act occurred or that a discriminatory policy existed' within the period prescribed by the statute." Gonzalez Garcia, 214 F. Supp. 2d at 202.

Defendants argue that since, in the 2007 Second Amended Complaint, Muñoz alleges that she was subjected to political harassment after Questell became mayor in 2005, her claims are time-barred. Upon reviewing the record, this Court notes that per Plaintiffs' opposition, and the Second Amended Complaint, Muñoz alleges that her work situation became unreasonable and significantly inferior to the norm for her position after July 15, 2005. She further alleges that the November 2005 memos sent by Vargas adversely affected her health.

As in Jiménez's case, Muñoz does not assert any claims of political harassment, or allege that she was deprived of her duties in the October 2006 Amended Complaint. Muñoz also appears only in her capacity as a career employee. Since Questell became mayor in January 2005, and Muñoz's work condition was adversely changed starting July 15, 2005, she knew about her injury at least as of July 15, 2005. Insofar as the Amended Complaint was filed in October 2006, and the Second Amended Complaint was filed in October 2007, Muñoz's political harassment claims are also time-barred. Even the November 2005 memos sent by Vargas are not actionable under  either amended complaint. Thus Muñoz's political harassment/"short of dismissal" claims are time-barred, and her claims are also **DISMISSED with prejudice**.

*Career Employees' Procedural Due Process Claims*

Per the uncontested facts, in the October 17, 2005 dismissal letters from Questell to the career Plaintiffs, none of them were apprised of their right to request an informal hearing prior to the effective date of their terminations. Plaintiffs' AUF ¶ 35. Additionally, no informal pre-termination hearings were afforded by the Municipality to any of these plaintiffs. Id. Notwithstanding, Defendants allege that upon dismissal under the 2005 Lay Off Plan, the career Plaintiffs were informed of their right to file an appeal before CASARH. According to Defendants, the foregoing uncontested fact, together with the *Hudson-Parratt* doctrine, bar the career Plaintiffs' due process claims. In support of this argument, they posit that due process

violation claims, based on the unauthorized denial of pre-termination rights, fail when adequate post-deprivation remedies are provided to plaintiffs.  In opposition, and based on the Supreme Court's holding in <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. 532, 546 (1985), the career Plaintiffs allege that by failing to provide pre-termination hearings, Defendants violated their procedural due process rights. They also aver that Defendants failed to implement the five alternatives to dismissal set forth in Ordinance 28.

In order "to establish a procedural due process claims under Section 1983, a plaintiff must allege that he was deprived of a property interest by defendants acting under color of state law and without the availability of a constitutionally adequate process." <u>Maymi</u>, 515 F.3d at 29. "Property interests are not created by the Constitution; 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" <u>De Vélez  v. Zayas</u>, 328 F. Supp. 2d 202, 211 (D.P.R. 2004) (citing <u>Bd. of Regents v. Roth</u>, 408 U.S. 564, 577, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972).

Employees classified as "career" or permanent" have vested property rights, and cannot be deprived of that right without due process of law.  <u>Borges-Colon v. De Jesus-Flores</u>, 483 F.3d 1, 8 (1st Cir. 2006); <u>Figueroa-Serrano v. Ramos-Alverio</u>, 221 F.3d 1, 5 (1st Cir. 2000). At a minimum,  career employees are entitled to "notice and a meaningful opportunity to respond" prior to termination. <u>Figueroa</u>, 221 F.3d at 5-6 (citations omitted); <u>Monfort-Rodriguez</u>, 599 F. Supp. 2d at 168. At the pre-termination stage, due process requires that "[t]he tenured public employee [receive] oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." <u>Cleveland Bd. of Educ.</u>, 470 U.S. at 546.

This Court notes that, in invoking their procedural due process claims, the career Plaintiffs do not argue that the established state pre-termination procedures are deficient, but rather that Defendants deprived them of said rights because of their political affiliation. <u>Cronin</u>

v. Town of Amesbury, 81 F.3d 257, 260, n. 2 (1st Cir. 1996). It is uncontested that the career Plaintiffs have vested property rights in their employment, and that Defendants did not provide them with a pre-termination hearing prior to their dismissals.  However, despite Defendants' failure to provide Plaintiffs the procedure due prior to making the decision to terminate them, the career Plaintiffs cannot succeed on their procedural due process claim unless they can show that the state failed to provide them with an adequate post-deprivation remedy. Id. (citing Lowe v. Scott, 959 F.2d 323, 340-41 (1st Cir. 1992) ("If a state provides adequate postdeprivation remedies -- either by statute or through the common-law tort remedies available in its courts -- no claim of a violation of procedural due process can be brought under § 1983 against the state officials whose random and unauthorized conduct caused the deprivation.").

Under the *Hudson/Parratt* doctrine, "when a deprivation of a property interest is occasioned by random and unauthorized conduct by state officials, the Supreme Court has repeatedly emphasized that the due process inquiry is limited to the issue of the adequacy of the postdeprivation remedies provided by the state." Hadfield v. Mc Donough, 407 F.3d 11, 19 (1st Cir. 2005); Hudson v. Palmer, 468 U.S. 517, 533 (1984); Parratt v. Taylor, 451 U.S. 527 (1981). As a result, public entities are protected from federal due process claims where the denial of process was caused by the negligent or intentional misapplication of state law by a government official. Id. In interpreting said doctrine, this Circuit has held that "a government official has committed a random and unauthorized act when he or she misapplies state law to deny an individual the process due under a correct application of state law." Hadfield, 407 F.3d at 20. The underlying rationale behind this doctrine rests on the fact that a state cannot anticipate and control the random and unauthorized negligent or intentional conduct of its employees. Hudson, 468 U.S. at 533. More so considering that "one bent on intentionally depriving a person of his property might well take affirmative steps to avoid signaling his intent." Id.

The *Hudson-Parratt* doctrine has been applied in the public employment context. Specifically, the First Circuit stated that a plaintiffs' procedural due process claims fail when "state law clearly provided for adequate notice and there was no suggestion that either by formal or informal means the state had authorized the giving of inadequate notice to persons who may be terminated, or that this was any form of regular practice," and proper post-deprivation remedies were provided. Id. at 20; see also O'Neill v. Baker, 210 F.3d 41, 42, (1st Cir. 2000);

In the present case, Plaintiffs do not contest that they were informed about their right to appeal to CASARH, nor that state law establishes adequate pre-termination remedies for career employees. As a matter of fact, nineteen career employees laid off on November 2005 filed an appeal before CASARH. Defendants' SUF ¶ 32. Instead they argue that Defendants intentionally deprived them their right to a pre-termination hearing. As noted by this Circuit, "[i]n such situations, additional pre-deprivation safeguards would have little value in preventing an erroneous deprivation of the protected interest." Mard v. Town of Amherst, 350 F.3d 184, 193 (1st Cir. 2003). That is, in all likelihood, a pre-termination hearing would not have afforded the career Plaintiffs the relief they sought. Thus considering the above-cited case law, and that adequate post-deprivation remedies were afforded to Plaintiffs, their procedural due process claims fail. As to Jiménez and Muñoz, it is clear that "under Puerto Rico law, public employees have a property interest in their continued employment, not in the functions they perform." De Vélez v. Zayas, 328 F. Supp. 2d 202, 212 (D.P.R. 2004) (citations omitted). Any unreasonable deprivation of duties is properly addressed under their political discrimination claims. Therefore, the career Plaintiffs' procedural due process claims are **DISMISSED with prejudice**.

*Qualified Immunity*

Upon concluding that Plaintiff have pled a *prima facie* case of political discrimination, and that material issues of fact remain as to Defendants' motivation for the adverse employment

**Civil No. 06-1627 (SEC)**                                                  33

actions, this Court cannot grant summary judgment on Defendants' qualified immunity defense

at this time. See Orraca-Figueroa v. Torres-Torres, 288 F. Supp. 2d 176, 187 (D.P.R. 2003).

**Conclusion**

For the reasons stated above, Plaintiff's motion for summary judgment is **GRANTED in part and DENIED in part**. All Plaintiffs' procedural due process claims are **DISMISSED with prejudice**. Cereida Muñoz and Candida Jiménez's political harassment claims are **DISMISSED with prejudice**. All Co-Plaintiffs' political discrimination claims, except Angel L. Febus Rodríguez, Eugenio A. Reyes Alomar, Emma E. Espada Soto, Julio E. Espada Soto, Alma Jusino Guzman, Alma Mora Rivera, Farelyn Torres Colón, Karen I. Soldevila Muñoz, Luis A. Ithier Correa, Zasha Martínez Palermo, Ravindranas Laboy Cora, Angelita Rodríguez Colón, Héctor L. Rivera Briceno, Benoni Vega Suárez, Evelyn Leandry, Pablo Torres Rodríguez, Evelyn Rivas Rodriguez, Leslie Rentas Martinez, Ana Y. Cora Silva, Carlos Hernández Alvarado, Silverio Cruz Cintron, Angelo Pedroso Munera, and Lourdes Romero, are **DISMISSED with prejudice**.

**SO ORDERED.**

In San Juan, Puerto Rico, this 18th day of September, 2009.

*S/Salvador E. Casellas*
SALVADOR E. CASELLAS
U.S. Senior District Judge